**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR A BLACK NOKIA CELLULAR PHONE, MODEL 1280, IMEI: 354635/05/783140/1; SIM: LIBYA; IMSI: 892180004001928316; CURRENTLY LOCATED OUTSIDE THE UNITED STATES** | **Mag. No. ____________________**<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A SEARCH WARRANT**

I, VICTOR E. CAMAYA, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search a black Nokia cellular phone, model 1280, (IMEI: 354635/05/783140/1; SIM: Libya; IMSI: 892180004001928316), hereinafter "target cellular phone," further described in Attachment A, for the things described in Attachment B.

2. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since 2005. I began my career as a Special Agent in the New York Field Office, focusing on international counterterrorism investigations. While in the New York Field

Office, I was assigned to an extraterritorial squad (CT-3) with investigative responsibilities for Africa. The primary focus of CT-3 is to investigate crimes in or originating in Africa against American persons and/or American interests. In 2011, I transferred to FBI Headquarters, Counterterrorism Division in Washington, D.C., where my responsibilities included overseeing and coordinating FBI counterterrorism investigations throughout the world. I returned to the New York Field Office in 2013, in my present capacity, as the Supervisory Special Agent ("SSA") to the CT-3, where my responsibilities include overseeing all the New York Field Office's counterterrorism investigations involving Africa.

4. As a Special Agent, I have participated in hundreds of international investigations involving violations of U.S. criminal and terrorism laws. I have employed countless investigative tools in furtherance of these investigations, including search warrants, arrest warrants, wiretaps, undercover operations, witness interviews, and the use of confidential informants and cooperating subjects. I have also received specialized training in international counterterrorism investigations.

**FACTS AND CIRCUMSTANCES**

5. This affidavit is based, in part, upon information provided to me by other FBI agents; foreign law enforcement officers and government officials; witnesses; and other information gathered during the course of this investigation. Because this affidavit is being submitted for the limited purpose of obtaining a search warrant for the above-listed cellular phone, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause for the issuance of a search warrant for the target phones.

6. I make this affidavit, in part, on personal knowledge derived from my participation in this investigation and, in part, upon information and belief. As a result of my personal participation in the investigation detailed herein, and through interviews with and analysis of reports submitted by other law enforcement, I am familiar with all aspects of this investigation.

## STATUTORY AUTHORITY

7. This investigation concerns the September 11, 2012 terrorist attack on the U.S. Special Mission and Annex in Benghazi, Libya that resulted in the death of four Americans; and specifically, the alleged participation of Ahmed Abu KHATALLAH, also known as Ahmed Mukatalah, in the attack, and for violations of the following federal offenses: (1) killing a person in the course of an attack on a federal facility involving the use of a firearm and dangerous weapon and attempting and conspiring to do the same, in violation of 18 U.S.C. § 930(c); (2) providing, attempting and conspiring to provide material support to terrorists resulting in death, in violation of 18 U.S.C. § 2339A; and (3) discharging, brandishing, using, carrying and possessing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).

## DEFINITIONS

8. The following term has the indicated meaning in this affidavit:

a. A cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless

telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system technology for determining the location of the device.

b. IMEI or International Mobile Station Equipment Identity is a serial number that uniquely identifies a mobile phone. It is usually found printed inside the battery compartment of the phone, but can also be displayed on-screen on most phones.

c. IMSI or International Mobile Subscriber Identity is used to identify the user of a cellular network and is a unique identification associated with all cellular networks. The first three digits of the IMSI represent the country code, followed by the network code.

d. SIM card or Subscriber Identity Module card is an integrated circuit that securely stores the IMSI and the related key used to identify and authenticate subscribers on the mobile telephony devices (such as mobile phones and computers).

**PROBABLE CAUSE**

***Evidence of the Crime***

9. In November 2011, the United States Department of States ("DOS") established a diplomatic post in Benghazi, Libya, known as the U.S. Special Mission ("Mission"). The Mission was typically occupied by a small contingent of DOS personnel, including agents form the Diplomatic Security Service ("DSS"). On September 11, 2012, it was occupied by a total of seven U.S. citizens, including U.S. Ambassador John Christopher Stevens, DOS Information Management Officer ("IMO") Sean Smith, and five DSS agents.

10. On September 11, 2012, at approximately 9:45 p.m., the occupants heard chanting, gunfire and a loud explosion in the vicinity of the Mission's main gate. The DSS agents reacted immediately to what appeared to be an attack on the Mission. Three DSS agents went to retrieve their rifles and survivals bags. A fourth agent secured Ambassador Stevens and IMO Smith in a safe haven within the Mission's main residence, which was referred to as Villa C. The fifth agent monitored the attack on the Mission's closed circuit surveillance system and called for help.

11. At this point, a group of 20 or more armed man, many of whom were armed with AK-47-type assault rifles, was seen just outside the main gate of the Mission. The group of men aggressively rushed the main entrance and gained access to the Mission. Many of these individuals were observed running through the compound, discharging their weapons, forcibly attempting to gain access to buildings within the Mission compound, and defacing and looting property within the compound. The DOS personnel remained secured in various structures within the Mission compound.

12. The attackers then set fire to Villa C, which caused the building to fill with thick black smoke. The DSS agent within Villa C began having difficulty breathing. He then attempted to escort Ambassador Stevens and IMO Smith out of Villa C through a window. The DSS agent was able to make his way to a bedroom and extricate himself through a window. Upon exiting Villa C, the DSS agent began receiving gunfire. Ambassador Stevens and IMO Smith remained within Villa C. The DSS agent reentered Villa C several times in an effort to rescue Ambassador Stevens and IMO Smith. His attempts proved unsuccessful.

13. He was soon joined by three of the other DSS agents. They continued the search of Villa C, locating the body of IMO Smith who appeared to have died from smoke inhalation. The DSS agents, who were later joined by a U.S. security team, continued to search Villa C for the Ambassador. Again, they were unsuccessful in locating the Ambassador. The five DSS agents then evacuated from the Mission in an armored vehicle. As they began to drive away from the Mission, several of the attackers opened fire on the agents' armored vehicle, causing considerable damage to the vehicle. The agents, however, were able to successfully escape from the Mission to a nearby U.S. facility known as the Annex.

14. The Annex was also attacked throughout the morning of September 12, 2012, culminating in a mortar attack, which resulted in the death of two more Americans.

15. On the morning of September 12, 2012, the DSS agents evacuated the city of Benghazi with other U.S. personnel via the Benghazi Airport. While at the airport, the DSS agents learned that the Ambassador's body had been located in Villa C by Libyan nationals, and that his body had been taken to a local hospital. Several Libyan nationals subsequently delivered the Ambassador's body to the Benghazi Airport. The DSS agents and other U.S personnel,

including the bodies of Ambassador Stevens, IMO Smith and the other two Americans, were airlifted to Tripoli.

16. The bodies of Ambassador Stevens, IMO Smith and the other two Americans were eventually transported to the U.S. Department of Defense Armed Forces Medical Examiner System, in Dover, Delaware for autopsies, which revealed the cause and manner of death. The medical examiner ruled that Ambassador Stevens and IMO Smith died of carbon dioxide poisoning, which is consistent with death by smoke inhalation, and that manner of their deaths was homicide. The medical examiner ruled that the other two Americans died of ballistic injuries, which is consistent with death by mortar fire, and that the manner of their deaths was homicide.

***Probable Cause that Evidence Exists on Target Cellular Phone***

17. The FBI initiated an investigation into the attack on the Mission immediately following the attack. The FBI identified Ahmed Abu KHATALLAH, also known as Ahmed Mukatalah, as one of the participants in the attack on the Mission and Annex. KHATALLAH is a Libyan national and resident of Benghazi. He has no known ties to the United States, and is currently outside the United States.

18. The investigation revealed that KHATALLAH is a leader of an Islamic extremist militia in Benghazi, known as Ansar Al Shari'a ("AAS"). AAS is known for its anti-Western rhetoric and for advocating Sharia law throughout Libya. DOS designated AAS in Benghazi, a Foreign Terrorist Organization on January 10, 2014.

19. On July 15, 2013, a sealed criminal complaint and arrest warrant were issued for KHATALLAH by the United States District Court for the District of Columbia for his

participation in the attack on the Mission and Annex. On June 15, 2014, KHATALLAH was captured in Libya. At the time of his capture, several items were recovered on or about his person, including a firearm and three cellular telephones - specifically: (1) a black Nokia cellular phone, model 1280, IMEI: 354635/05/783140/1; SIM: Libya; IMSI: 892180004001928316; (2) a black Nokia cellular phone, model 1280, IMEI: 354563/05/937648/2; SIM: Al Madar; IMSI: 8921801000061654752; and (3) a black Nokia cellular phone, model 1280, IMEI: 356712/05/523466/0; SIM: Al Madar; IMSI: 8921801000085541894.

20. The FBI was able to obtain the Mission's closed circuit surveillance video, which had been recorded during the attack. The video shows the start of the attack at 9:45 p.m. at the Mission's main gate and continues through the end of the attack at approximately midnight. KHATALLAH appears on the video, within the Mission compound shortly before midnight. He appears with numerous armed individuals, including several of the attackers who were involved in the initial breach of the Mission's main gate at 9:45 p.m. As KHATALLAH is seen walking around the Mission compound, there appears to be a cellular phone in his hand.

21. The FBI interviewed a witness, hereinafter referred to as "CW-1," who stated it knew KHATALLAH to be associated with AAS. CW-1 further stated that it saw KHATALLAH at the Mission on the night of the attack at approximately midnight with several armed men. CW-1 observed some of these armed men discharging their weapons in celebratory fire and yelling "Allahuakbar" (which means "God is great"). Shortly thereafter, CW-1 heard KHATALLAH claim responsibility for the attack, claiming that it was carried out to honor the Prophet Mohammad. KHATALLAH also expressed his hatred of the Americans, describing the United States as an oppressor. CW-1 also viewed the above-described surveillance video and

positively identified the image of the person described above with the cellular phone in his hand as KHATALLAH.

22. The FBI interviewed a second witness, hereinafter referred to as "CW-2." CW-2 described knowing KHATALLAH, and also positively identified him from the same surveillance video image described above. CW-2 described KHATALLAH as a leader of the Islamic extremists in Benghazi. CW-2 advised that shortly after the attack, KHATALLAH admitted being present at the Mission. CW-2 also advised that on a subsequent occasion in late 2013, KHATALLAH described planning other attacks or operations against American interests in Libya. KHATALLAH indicated that he was coordinating these plans with others throughout Libya. Additionally, CW-2 indicated that, as recently as 2014, KHATALLAH continued to maintain a relationship with an individual who has been identified as one of the initial attackers on the Mission; thus, suggesting that KHATALLAH continues to communicate with his co-conspirators.

23. The above narrative establishes that there is probable cause to believe that evidence exists on the seized items relevant to this criminal investigation. In sum: (1) The criminal complaint establishes that KHATALLAH participated in the attack on the Mission and Annex. (2) While at the Mission and during the attack, KHATALLAH appears to have his cellular phone in hand, suggesting use before, during or after the attack. (3) The attack involved multiple armed attackers acting in concert, suggesting prior planning and coordination, which would require prior communication. (4) As of late 2013, KHATALLAH continued to target U.S. interests in Libya with other extremists throughout Libya. This too requires planning, coordination and communication. (5) The fact that KHATALLAH is found with a firearm and

three phones has added significance. Based on my training and experience, it suggests that KHATALLAH, who is a leader of AAS Benghazi, compartmentalizes his communications. It is not uncommon for a leader of a terrorist organization to use different methods of communication when speaking to different members or associates of the organization. For example, a terrorist leader may use different phones or modes of communication (i.e., voice messages, text messages, email messages) when communicating with the organization's leadership/management; financiers; arms suppliers; soldiers/assassins; allies; corrupt government officials, etc. Compartmentalizing communication makes it more difficult for law enforcement authorities to identify the members of the terrorist organization or to disrupt its criminal activity.

24. The three cellular phones that were seized from KHATALLAH, including the target cellular phone, are currently outside the United States in the control and custody of the FBI,[1] and making their way back to the United States on board a U.S. vessel. The FBI is seeking permission to commence the search of the target cellular phone while the phone is outside the United States. This will aid in the investigation. It is expected that the search of the target

---

[1] As noted above, KHATALLAH is foreign national, who is currently outside the United States, and has no contacts with the United States. In light of the defendant's status and the status of the target cellular phone, the government asserts that it is not constitutionally required to obtain a search warrant to search the target cellular phone, see United States v. Verdugo-Urquidez, 110 S.Ct 1056, 1061 (1990) (the purpose of the Fourth Amendment is to "protect the people of the United States against arbitrary action by their own government," and not "intended to restrain the actions of the Federal Government against aliens outside of the United States territory"). Nonetheless, Federal Rule of Criminal Procedure 41 allows a magistrate to issue a search warrant for property outside the United States in an investigation involving international terrorism, see Fed R.Crim P. 41(b)(3), or for property outside the United States, but within a United States possession. See Fed. R.Crim.P. 41(b)(5)(A). This is an investigation involving international terrorism; and the government asserts that a U.S. vessel, which is solely under the control of the United States, is analogous to a U.S. possession. The government is seeking this warrant out of an abundance of caution.

cellular phone will continue once it arrives in the United States, and ultimately in the District of Columbia.

**REQUEST TO SEARCH THE TELEPHONE**

25. In light of the foregoing information, and based on my training and experience, I submit that there is probable cause to believe that the above-listed target cellular phone contains evidence of violations of 18 U.S.C. § 930(c), 18 U.S.C. § 2339A, and 18 U.S.C. 924(c), and property or information designed for use, intended for use, or used in committing such offenses. Specifically, in this case, the target cellular phone likely contains evidence concerning the identity of co-conspirators, communications related to the conspiracy, location and travel information related to the conspiracy, evidence concerning the user's state of mind, and evidence concerning ownership or possession of the target cellular phone. The information likely to be contained in the target cellular phone is any form of communication permissible through the use of the phone, including, but not limited to, any voice communications, text messages, voice mail, electronic mail communications, address books, contact lists, call logs, text logs, communication logs, photographs, video, calendars as well as the items described in Attachment B. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search, analyze, and test electronic devices that are evidence of crime, and property designed for use, intended for use, or used in crime.

**ELECTRONIC DEVICES AND STORAGE**

26. As described above and in Attachment A, this application seeks permission to search the target cellular phone, currently located outside the United States, which was seized from KHATALLAH, incident to his June 15, 2014 capture in Libya by U.S. personnel.

27. Based on my knowledge, training, and experience, I know that electronic devices, such as the target cellular phone, can store information for long periods of time, including items of evidence described in Attachment B. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools.

28. Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, law enforcement agents intend to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

## CONCLUSION

29. Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe that there currently is located on the above-listed target telephone evidence, and property or information designed for use, intended for use, or

used in committing violations of federal criminal statutes, including, 18 U.S.C. § 930(c); 18 U.S.C. § 2339A; and 18 U.S.C. § 924(c).

30. Your affiant, therefore, respectfully requests that the attached warrant be issued authorizing the search of the target telephone listed in Attachment A.

______________________________________

VICTOR E. CAMAYA, Supervisory Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me telephonically per Fed. R. Crim. P. 41(d)(3) before me on_____________________, 2014.

________________________

JOHN M. FACCIOLA
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR A BLACK NOKIA CELLULAR PHONE, MODEL 1280, IMEI: 354635/05/783140/1; SIM: LIBYA; IMSI: 892180004001928316; CURRENTLY LOCATED OUTSIDE THE UNITED STATES** | **Misc. No. ____________________**<br><br>**UNDER SEAL** |

**ATTACHMENT A**

The item to be searched is a black Nokia model 1280 cellular phone, IMEI: 354635/05/783140/1; SIM: Libya; IMSI: 892180004001928316; currently located outside the United States, which was seized from Ahmed Abu KHATALLAH, incident to his June 15, 2014 capture in Libya.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR A BLACK NOKIA CELLULAR PHONE, MODEL 1280, IMEI: 354635/05/783140/1; SIM: LIBYA; IMSI: 892180004001928316; CURRENTLY LOCATED OUTSIDE THE UNITED STATES** | **Misc. No. ____________________**<br><br>**UNDER SEAL** |

**ATTACHMENT B**

1. All records and items on the cellular phone described in Attachment A that relate to evidence of a crime, including violations of 18 U.S.C. § 930(c) (killing in the course of an attack on a federal facility); 18 U.S.C. § 2339A (material support); and 18 U.S.C. § 924(c) (possession of a firearm in relation to a crime of violence), or is property or information designed or intended for use, or used in the commission of such violations, including, but not limited to: any voice communications, text messages, voice mail, electronic mail communications, address books, contact lists, call logs, text logs, communication logs, photographs, video, calendars, correspondence, records, documents, including;

a. Records or information relating to the identification of co-conspirators or the relationship between or among co-conspirators involved in the attack or other planned attacks against the interests of the United States;

b. Records or information relating to any agreement, communication, pre-planning or coordination prior to or during the attack on the Mission;

c. Records and information documenting any transfer(s) or payment(s) between and among any co-conspirators;

d. Records or information relating to KHATALLAH's whereabouts, location, schedule, travel from on or about September 10, 2012 through September 13, 2012.

e. Records or information relating to the KHATALLAH's intent or state of mind; and

f. Records or information relating to who used, owned, possessed, or controlled the target cellular phone.

2. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form or electronic storage and any photographic form.